UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**DIRECT MAIL HOLDING, LLC, et al.,**

    **Plaintiffs,**

vs.                                                    Case No.: 8:12-CV-145-T-30EAJ

**JUNE BUSH, et al.,**

    **Defendants.**

_____/

## REPORT AND RECOMMENDATION

Before the court are Plaintiffs Direct Mail Holding, LLC ("Direct Mail"), Focus Direct, LLC ("Focus Direct"), and Diamondback Direct's ("Diamondback") **Motion for Preliminary Injunction** (Dkt. 3) and Defendants June Bush, Laura Bush, Candace Pearl, Pearl Productions, Inc., and Opulent Detail Designs, Inc.'s ("Opulent") **Opposition** (Dkt. 11).[1] Having conducted a hearing on the motion, it is recommended that the motion for a preliminary injunction be denied as Plaintiffs have not demonstrated a likelihood of success on the merits of their breach-of-contract or misappropriation claims.

## Background

Defendant June Bush ("June Bush") is a former employee of Plaintiff Focus Direct. Plaintiffs filed the present suit to enforce a noncompetition and confidentiality agreement that June Bush signed while employed by Focus Direct. Plaintiffs allege that Defendants misappropriated Plaintiffs' trade secrets and that June Bush engaged in certain misconduct while employed by Focus Direct, such as participating in a competing business and urging Plaintiffs' clients to take their

---

[1] The motion was referred to the undersigned for a report and recommendation.

business elsewhere. The complaint asserts ten counts under state law, including multiple counts for breach of the noncompetition agreement, misappropriation, conversion, tortious interference, breach of the duty of loyalty, and deceptive and unfair trade practices.[2]

Three days after filing their complaint, Plaintiffs moved for a preliminary injunction seeking to: (1) enjoin June Bush from engaging in any business activity competitive with Plaintiffs; and (2) enjoin Defendants from using and disclosing Plaintiffs' trade secrets and company information and requiring Defendants to return such materials to Plaintiffs.

### Findings of Fact

1. Direct Mail is a Delaware company with its principal place of business in Iowa.
2. Focus Direct is a Delaware company with its principal place of business in Texas.
3. Diamondback is a division of Alaniz, LLC. Diamondback's principal place of business is in Maryland.
4. The individual Defendants, June Bush, Laura Bush, and Candace Pearl are Florida residents.
5. Pearl Productions is Florida a corporation, and its principal place of business is in Florida. The two directors and officers of Pearl Productions are Candace Pearl, Inc., which is wholly owned and operated by Candace Pearl, and Opulent Detail Designs, Inc. (Defs' Ex. 5)
6. During the time that June Bush was employed by Focus Direct, she received money from Pearl Productions and its predecessor, Pearl Promotions (Dkt. 26 ¶ 17). According to Plaintiffs' verified complaint, Pearl Productions and Pearl Promotions are competitive with Plaintiffs, and June Bush participated in these competitive businesses during the time she was employed by Focus Direct (Dkt. 1 ¶¶ 7-8).

---

[2] On February 17, 2012, Defendants filed a motion to dismiss for failure to state a claim.

7. Opulent is a Florida corporation. Laura Bush is the president and only shareholder of Opulent. (Defs' Ex. 6)

8. Direct Mail and its subsidiaries are in the direct-mail-fund-raising industry. The direct-mail-fund-raising industry is involved in the creation, manufacture, and distribution of fund-raising materials, such as letters, coupons, and specialty items known as premiums (e.g., blankets, key chains, magnets, pens, etc.).

9. Focus Direct is a subsidiary of Direct Mail. Focus Direct engages in production work, including the manufacture and distribution of mailings. Diamondback is also a subsidiary of Direct Mail. Diamondback engages in the sourcing of premiums, including premiums from suppliers in China.

10. June Bush was employed by Focus Direct and its predecessors as a salesperson for thirty-two years. June Bush's employment with Focus Direct ended in December 2011.[3]

11. June Bush received commissions from Focus Direct. From 2009 to 2011, June Bush's yearly income ranged from $280,000 to more than $350,000.

12. On July 15, 2005, June Bush signed a noncompetition and confidentiality agreement ("NCA") in connection with a restructuring of the ownership of Focus Direct and other affiliate companies. (Plfs' Ex. 1)

13. On July 15, 2005, June Bush signed a commission agreement with Focus Direct. (Plfs' Ex. 2) Focus Direct provided the commission agreement because June Bush and other members of the sales force refused to sign the NCA unless their commissions were guaranteed in

---

[3] Although the parties dispute whether she was fired or whether she resigned, this dispute is not material to the issues presented.

writing (Dkt. 12 ¶ 4).

14. The NCA states that it was entered into in consideration of Direct Mail consummating an equity purchase agreement and offering June Bush continued employment. The NCA also states: "this [a]greement shall automatically terminate in the event the closing under the Equity Purchase Agreement is not consummated by July 29, 2005." (Plfs' Ex. 1)

15. The NCA provides that during the "Restricted Period," June Bush "shall not, directly or indirectly, engage in any . . . business activities that are competitive with the business of the [Direct Mail] Companies." (Id.) The Restricted Period is the longer of: five years after the date of the agreement or one year after the termination of Bush's employment. (Id.)[4] The Restricted Period is shortened to six months if Bush's employment is terminated without cause.

16. The equity purchase agreement was signed on August 1, 2005 in connection with the restructuring of Focus Direct and its affiliates. (Id.; Dkt. 26 ¶ 24). As part of the equity purchase agreement, June Bush received cash and an equity interest in Direct Mail or its affiliates.

17. In May 2009, Focus Direct reduced June Bush's compensation by ten percent and ceased making matching contributions to her employee retirement plan. An April 17, 2009 letter from Focus Direct's Managing Director announcing the pay and benefits reduction characterized the reduction as a temporary measure necessitated by economic conditions. (Defs' Ex. 9) Bush complained about the compensation reduction on multiple occasions but

---

[4] More than five years has passed since the date of the NCA, so the Restricted Period is at most one year.

was told nothing could be done (Dkt. 12 ¶ 5).

18. In August 2010, Focus Direct restored June Bush's compensation rate, but June Bush was not repaid for the compensation and benefits reduction for the period between May 2009 and August 2010. The total amount of compensation and benefits reduction for that period is over $65,000 (id.).

19. In the course of her employment with Focus Direct, Bush received documents, data, and information that contained or constituted confidential information of Focus Direct or other Direct Mail companies. Some of the materials that Bush possessed after she ceased employment with Focus Direct was confidential information of Focus Direct or the other Direct Mail companies. (Defs' Ex. 4, 11-19; Dkt. 26 ¶ 21)

20. Plaintiffs filed this action on January 24, 2012 and moved for a preliminary injunction on January 27, 2012.[5]

21. On or about January 27, 2012, June Bush surrendered to her attorney all the confidential information that she previously possessed concerning Focus Direct and the other Direct Mail companies (Dkt. 12 ¶ 6i; Dkt. 14 ¶ 16). She also had her computer scrubbed (Dkt. 12 ¶ 6i). She claims that she has not shared this information with anyone else.

22. Laura Bush and Candace Pearl do not possess confidential information relating to the Direct Mail companies (Dkt. 15 ¶ 4; 16 ¶ 2-3).

**Burden of Proof**

When seeking a preliminary injunction, a plaintiff must establish "that he is likely to succeed

---

[5] On or about December 22, 2011, June Bush filed an action against Focus Direct in Texas state court seeking a judgment declaring that the NCA is unenforceable (Dkt. 1 Ex. 3; Dkt. 14 ¶ 3). Apparently, no injunctive relief has been sought in the Texas case.

on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). Given the "extraordinary and drastic" nature of preliminary injunctions, relief may be granted only where the plaintiff clearly satisfies the burden of persuasion as to each of these requirements. All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc., 887 F.2d 1535, 1537 (11th Cir. 1989). To meet its burden the plaintiff may rely on affidavits and hearsay materials that would not be admissible as evidence for the entry of a permanent injunction. Levi Strauss & Co. v. Sunrise Int'l Trading Inc., 51 F.3d 982, 985 (11th Cir. 1995).

## Conclusions of Law

Plaintiffs argue that an injunction is appropriate based on their breach-of-contract and misappropriation claims. Defendants respond that injunctive relief should be denied because the NCA is unenforceable and Plaintiffs cannot demonstrate a likelihood of success or irreparable harm as to their misappropriation claim. The parties agree that if the NCA is enforceable, Delaware law governs the agreement.[6] The parties also agree that Florida law controls Plaintiffs' misappropriation claim.

The most complicated issue involves the breach-of-contract claims. For the following reasons, Plaintiffs' request for injunctive relief should be denied because they have not met their burden of demonstrating a likelihood of success on the merits of their breach-of-contract and misappropriation claims.

---

[6] Section eight of the NCA provides that "[t]he internal laws . . . of the State of Delaware will govern all questions concerning the construction, validity and interpretation of this [a]greement and the performance of the obligations imposed hereby." (Plfs' Ex. 1)

1.  **Breach-of-Contract Claims**

Even assuming that June Bush is working in competition with her former employer, one of her defenses – antecedent breach – has considerable merit, based on the record at this point. However, her attack on the initial validity of the NCA is unpersuasive.[7]

   a.  **Automatic Termination of the NCA**

The NCA states that it was entered in consideration for Direct Mail consummating the equity purchase agreement and offering June Bush continued employment. Section eleven of the NCA states: "this [a]greement shall automatically terminate in the event the closing under the Equity Purchase Agreement is not consummated by July 29, 2005." (Plfs' Ex. 1) The equity purchase agreement was not signed until August 1, 2005. However, Plaintiffs contend that June Bush waived her right to object to the enforcement of the NCA because she took advantage of the opportunities afforded to her under the equity purchase agreement.

Defendants respond that the NCA automatically terminated when the equity purchase agreement did not close by July 29, 2005. According to Defendants, there was no termination right for June Bush to waive because the NCA terminated on its own. Furthermore, Defendants maintain that June Bush took no action that could be construed as a waiver of her termination right.

A party may waive a contractual requirement or condition. Amirsaleh v. Bd. of Trade of N.Y., 27 A.3d 522, 529 (Del. Super. Ct. 2011). Establishing waiver requires that: (1) the condition be capable of being waived; (2) the waiving party have knowledge of the condition being waived; and (3) the waiving party have an intent to waive the condition. Id. at 529-30. The party asserting

---

[7] At the hearing, Defendants' counsel attempted to draw a distinction between June Bush receiving money from Pearl Productions and Bush being employed by Pearl Productions. This is a distinction without a difference in the court's view, and this fact weighs in favor of Plaintiffs.

waiver must prove that the waiving party had actual or constructive knowledge of the right waived. Julian v. E. States Constr. Serv., Inc., No. 1892-VCP, 2009 WL 1211642, at *8 (Del. Ch. May 5, 2009). A party may not accept the benefits provided by a contract while shirking the burdens. Id.

The termination provision is a condition capable of being waived. See Amirsaleh, 27 A.3d at 530; Ashall Homes Ltd. v. ROK Entm't Grp. Inc., 992 A.2d 1239, 1247-48 (Del. Ch. 2010). Here, Bush waived her rights under the termination provision, and the NCA did not terminate pursuant to § 11. June Bush received constructive, if not actual, notice of the provision when she signed the NCA two weeks prior to the termination date. Defendants argue that June Bush received no benefits under the NCA. However, continued employment is sufficient consideration to support a restrictive covenant. See Research & Trading Corp. v. Powell, 468 A.2d 1301, 1305 (Del. Ch. 1983). Moreover, the NCA states that it was entered into in consideration for Direct Mail closing on the equity purchase agreement. Though the equity purchase agreement was closed three days late, June Bush knowingly received benefits under the agreement in the form of cash and an equity interest in Direct Mail or its affiliates. Having accepted benefits under the NCA, June Bush cannot disclaim its burdens on the basis of the delayed closing.[8] This does not resolve Plaintiffs' breach-of-contract claims, however, as June Bush advances a substantial defense to enforcement of the NCA.

### b. Antecedent Breach of the Commission Agreement

The same day that June Bush signed the NCA, she also signed a commission agreement that set the commissions she was to receive on sales. In May 2009, Focus Direct reduced the compensation of its exempt employees, including June Bush, and eliminated the company's

---

[8] In any event, based on discussions at the conclusion of the hearing regarding additional exhibits proffered by Plaintiffs (but not admitted in evidence), Plaintiffs should be able to prove that June Bush explicitly agreed to an extension of the closing date to August 1, 2005.

matching contributions to the employee retirement plan. In August 2010, Focus Direct restored June Bush's compensation to its prior rate, but she was not repaid for the fifteen months of reduced compensation and benefits.

Bush asserts that she was relieved of her obligations under the NCA when she left the company because Focus Direct breached the commission agreement by reducing her compensation during her employment. She claims approximately $65,000 in reduced compensation and thousands more in retirement benefits. Plaintiffs respond that June Bush expressly and impliedly agreed to the pay reduction and that, despite the reduction, she received ample consideration to support the covenants contained in the NCA. Plaintiffs also submit that the covenants contained in the commission agreement are independent of June Bush's covenant not to compete.

As an initial matter, the court need not decide whether the commission agreement is governed by Delaware law or Florida law. The laws of both states do not materially differ as to the issues presented.

When agreements concerning the same subject matter or transaction are executed at or about the same time, by the same parties, the agreements should be construed together. See Ashall, 992 A.2d at 1250-51, 1251 n.56; Int'l Ship Repair & Marine Servs., Inc. v. Gen. Portland, Inc., 469 So. 2d 817, 818 (Fla. 2d DCA 1985) (citation omitted). June Bush signed the NCA and the commission agreement on the same day. Both agreements state that they were entered into in connection with the equity purchase agreement and Direct Mail's acquisition of other companies.[9] Further, June

---

[9] The commission agreement is between June Bush and Focus Direct, but Focus Direct is not listed as a party on the NCA. (Plfs' Ex. 1, 2) However, Direct Mail is a party to the NCA, and both agreements were entered as part of Direct Mail's acquisition of Focus Direct. Furthermore, the NCA states that it precludes competition with Focus Direct as a Direct Mail company. Thus, the fact that the parties to the NCA and the commission agreement are not the same does not prevent the

Bush avers that Focus Direct provided the commission agreement after she and other members of the sales force refused to sign the NCA unless their commissions were guaranteed in writing. And the commission agreement states that it is to remain in effect as long as the NCA remains in effect. Consequently, the agreements are part of the same transaction and should be construed together.

A party may be excused from its obligations under a contract by a material, antecedent breach of another party. See Bradley v. Health Coal., Inc., 687 So. 2d 329, 333 (Fla. 3d DCA 1997); Hudson v. D & V Mason Contractors, Inc., 252 A.2d 166, 170 (Del. Super. Ct. 1969). More specifically, an employee is relieved of his or her obligations under a noncompetition agreement if the employer unilaterally denies compensation owed to the employee. See S. Wine & Spirits of Am., Inc. v. Simpkins, No. 10-21136-CIV, 2011 WL 124631, at *7 (S.D. Fla. Jan. 14, 2011) (citing Benemerito & Flores, P.A. v. Roche, 751 So. 2d 91, 94 (Fla. 4th DCA 1999)); L & W Ins., Inc. v. Harrington, No. 2730-VCP, 2007 WL 2753006, at *8 (Del. Ch. Mar. 12, 2007) (citation omitted).

Plaintiffs contend that June Bush expressly agreed to the compensation reduction. As evidence of her express agreement, Plaintiffs cite a March 2, 2010 email from June Bush stating that she has "given up thousands of dollars in commissions since May 1, 2009 in order to help this company become more profitable, with the promise of that being temporary." (Defs' Ex. 2) June Bush denies that she agreed to the pay reduction (Dkt. 12 ¶ 5). The March 2, 2010 email was not sent in connection with a discussion concerning June Bush's compensation. Rather, the focus of the email is Bush's concerns that Focus Direct might be shut down and its operations transferred to a different company. Although the March 2010 email states that June Bush gave up compensation for the benefit of Focus Direct, this appears to reflect the explanation given in the April 2009 letter

---

agreements from being construed together.

announcing the reduction that it was related to the economic health of the company. (Defs' Ex. 9) Considering the context of the March 2010 email, Bush's statement is more akin to a historical fact, not an expression of assent to the pay reduction.[10]

Plaintiffs further contend that June Bush impliedly agreed to the pay reduction by continuing to work at Focus Direct. A written agreement may be modified by the parties' subsequent course of conduct. St. Joe Corp. v. McIver, 875 So. 2d 375, 382 (Fla. 2004) (citations omitted); Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc., 297 A.2d 28, 33 (Del. 1972). But a party may not unilaterally modify a contract; all parties whose rights are affected by the modification must consent. See St. Joe, 875 So. 2d at 382; Cantor Fitzgerald, L.P. v. Cantor, No. 16297, 2000 WL 307370, at *26 (Del. Ch. Mar. 13, 2000). The April 17, 2009 letter announcing the pay cut does not give employees an option to accept or reject the reduction. And June Bush avers that she repeatedly complained about the reduction, but was told nothing could be done. As she did not have the option to accept or reject the pay reduction, her conduct subsequent to the pay reduction does not suggest a consent to modify the commission agreement.[11]

As for Plaintiffs' contention that the covenants contained in the commission agreement were independent of June Bush's covenant not to compete, Plaintiffs point to § 2(c) of the NCA that states

---

[10] June Bush has also submitted a declaration by Mary Ann Korzekwa, a Managing Director at Focus Direct, who avers that she told June Bush that if her commission structure ever changed, the NCA would "become void" (Dkt. 13 ¶ 6).

[11] Plaintiffs rely on Kupscznk v. Blasters, Inc., 647 So. 2d 888 (Fla. 2d DCA 1994) in arguing that June Bush impliedly accepted the compensation reduction by continuing to work at Focus Direct. However, Kupscznk is distinguishable in that the employee's original compensation structure was not reduced to writing, and there was no indication the employee was promised a certain salary or commission. 647 So. 2d at 889. Furthermore, the employee signed documentation detailing the new compensation arrangement after the employee's compensation was reduced. Id.

11

"[t]his [a]greement shall not be deemed or construed . . . to grant to Employee the right to receive any guaranteed base compensation, bonus awards, commissions, fees for professional services or any other payments." (Plfs' Ex. 1) This argument is unpersuasive.[12]

Lastly, Plaintiffs submit that the NCA is enforceable despite the pay reduction because June Bush received adequate consideration to support the restrictive covenant. The plaintiffs in Simpkins, 2011 WL 124631 and Dickinson Med. Grp., P.A. v. Foote, No. 84C-JL-22, 1989 WL 40965 (Del. Super. Ct. Mar. 23, 1989) asserted a similar argument. In Simpkins, the plaintiff argued that its antecedent breach was not material because the unpaid compensation ($293,138) constituted less than three percent of the total compensation paid to the defendant. Simpkins, 2011 WL 124631, at *7. The court rejected that argument, however, because the "material breach of an employment contract does not rest upon value of the amount underpaid; it rests squarely on whether the full amount due was . . . withheld wrongfully." Id.

Similarly, in Dickinson, the plaintiff argued that a bonus reduction between $1,000 and $2,000 was not a material breach where the defendant was paid a salary of $60,000 per year. 1989 WL 40965, at *7. The court disagreed and held that the plaintiff's antecedent breach excused the defendant from her obligations under a noncompetition agreement. Id. at *8; see also L & W Ins., 2007 WL 2753006, at *10 (finding that a withheld commission of approximately $15,400 was a material breach that excused the employee from his obligations under a noncompetition agreement).

Here, June Bush's compensation was reduced by ten percent over fifteen months, and she lost

---

[12] Although § 2(c) arguably conflicts with the commission agreement's guarantee of compensation, "it is axiomatic that the specific provisions of [an] agreement are to take precedence over the general provisions of the . . . agreement if a conflict between such provisions is deemed to exist." Int'l Ship Repair & Marine, 469 So. 2d at 818; see also Global Energy Fin. LLC v. Peabody Energy Corp., No. 08C-10-129 RRC, 2010 WL 4056164, at *22 (Del. Super. Ct. Oct. 14, 2010).

more than $65,000 in pay and benefits. As June Bush has presented a substantial defense at this stage to Plaintiffs' breach-of-contract claims involving the NCA, Plaintiffs have not established that they are likely to succeed on the merits of their breach-of-contract claims. See generally Suntrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1276 (11th Cir. 2001) (reversing a district court's finding that the plaintiff demonstrated a likelihood of success on the merits where the defendant established that it had a substantial defense to liability); Simpkins, 2011 WL 124631, at *7; L & W Ins., 2007 WL 2753006, at *10.

**2.       Misappropriation Claim**

Florida law permits injunctive relief to enjoin actual or threatened misappropriation. Fla. Stat. § 688.003(1). Misappropriation involves the disclosure or use of a trade secret, without consent, by a person who acquired the trade secret under circumstances giving rise to a duty to maintain its secrecy or limit its use. Fla. Stat. § 688.002(2). "Florida law imposes upon every employee a duty not to use the employer's trade secrets for his own benefit, if the secret was acquired by the employee in the course of his employment." SMS, Inc. v. Brody, No. 8:08-CV-1151-T-30EAJ, 2008 WL 4613046, at *10 (M.D. Fla. Oct. 15, 2008) (citation omitted). A trade secret is information that: (1) derives independent economic value from not being generally known or readily ascertainable; and (2) is subject to efforts that are reasonable under the circumstances to maintain its secrecy. Fla. Stat. § 688.002(4).

The party seeking injunctive relief must show more than mere possession of a trade secret by the party it seeks to enjoin. Del Monte Fresh Produce Co. v. Dole Food Co., Inc., 148 F. Supp. 2d 1326, 1338 (S.D. Fla. 2001). "There must be a substantial threat of impending injury before an injunction will issue." Id. (quoting IBM Corp. v. Seagate Tech., Inc., 941 F. Supp. 98, 101 (D. Minn.

1992)).

While working for Focus Direct, June Bush received information concerning, <u>inter</u> <u>alia</u>, Plaintiffs' strategies, designs, artwork, sourcing, costs, pricing, profits, and financial performance. After June Bush's employment ceased, she possessed confidential information belonging to Focus Direct or other Direct Mail companies. Plaintiffs allege that Defendants misappropriated the information by using it in the course of competing with Plaintiffs through Pearl Productions. Plaintiffs also allege that Defendants are threatening to continue misappropriating Plaintiffs' trade secrets by refusing to return the materials despite the fact they are operating a competing business.

Defendants state that June Bush gave her attorney all the information that she previously possessed concerning Focus Direct and the other Direct Mail companies. June Bush avers that she hired a computer technician to download the information from her computer and save it to a removable disk (Dkt. 12 ¶ 6i). Following the download, the technician deleted the information from June Bush's computer, and she turned the information over to her attorney (<u>id.</u>). Both Laura Bush and Candace Pearl assert that they do not possess confidential information relating to the Direct Mail companies, and neither has used such information to compete with Plaintiffs through Pearl Productions.

Assuming <u>arguendo</u> that any of the information June Bush took from Focus Direct constitutes trade secret information, Plaintiffs cannot demonstrate a substantial likelihood of success on the misappropriation claim as Defendants do not currently possess trade secret or confidential information relating to the Direct Mail companies. To the extent that this issue bears on the second prong of the preliminary injunction test – irreparable harm – Plaintiffs should have an adequate remedy at law to rectify past harm. And Plaintiffs have not shown that June Bush has the present

ability to disclose or use, or threaten to disclose or use, any of Plaintiffs' confidential information, even if the information she took with her qualifies as trade secrets under Florida's misappropriation law.

## Conclusion

Plaintiffs have not demonstrated a likelihood of success on the merits of their breach-of-contract or misappropriation claims. It is unnecessary to address the other requirements for injunctive relief. Accordingly, and upon consideration, it is **RECOMMENDED** that Plaintiffs' **Motion for Preliminary Injunction** (Dkt. 3) be **DENIED**.

**Date: March 8, 2012**

ELIZABETH A JENKINS
United States Magistrate Judge

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of this service shall bar an aggrieved party from attacking the factual findings on appeal. See 28 U.S.C. § 636(b)(1).

**Any party objecting to this report and recommendation shall file a copy of the hearing transcript and provide specific citations to relevant portions of the transcript.**

Copies to:
District Judge
Counsel/Parties of record