UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| Direct Mail Holding, LLC, Focus Direct, LLC, and Diamondback Direct, a division of Alaniz, LLC<br><br>Plaintiffs,<br><br>v.<br><br>June Bush, Laura Bush, Candace Pearl, Pearl Productions, Inc., and Opulent Detail Designs, Inc.,<br><br>Defendants. | Civil Action No. 8:12-cv-00145-JSM-EAJ |

## VERIFIED AMENDED COMPLAINT

Plaintiffs Direct Mail Holding, LLC ("DMH"), Focus Direct, LLC ("Focus Direct"), and Diamondback Direct, a division of Alaniz, LLC ("Diamondback"), file this Amended Complaint against Defendants June Bush ("Bush"), Laura Bush ("Laura Bush"), Candace Pearl ("Pearl"), Pearl Productions, Inc. ("Pearl Productions"), and Opulent Detail Designs, Inc. ("Opulent").

### Preliminary Statement

1.     DMH and its subsidiaries are in the direct mail fundraising industry. Direct mail involves the creation, manufacture and distribution of fundraising materials (*e.g.*, letters, coupons, literature, *etc.*) and specialty items known as "premiums" (*e.g.*, blankets, key chains, magnets, pens, *etc.*) delivered through the mail. This business also involves the collection and processing of donations (known as "caging"), and the database services necessary to manage mailing lists, donor lists, donor contributions, and historical mailing information.

2.     DMH and its subsidiaries focus on clients in the non-profit sector. For example, they work with a variety of different religious, health (*i.e.*, cancer), and veterans organizations.

3.     Focus Direct is a subsidiary of DMH. It engages in production work (among other activities), including sourcing, manufacturing, assembling and distributing mailings.

Diamondback is another DMH subsidiary. It engages in the sourcing of premiums (among other activities), including premiums from suppliers in China.

4.     Bush worked for Focus Direct as a salesperson for 32 years, until her departure in December 2011. During that time, she worked primarily with three Focus Direct clients: (a) St. Jude Shrine ("St. Jude" or "SJS"), (b) an American veterans' organization called "AMVETS," and (c) St. Labre Indian School ("St. Labre" or "SLIS").

5.     The Plaintiffs are filing this lawsuit to obtain injunctive, equitable and legal relief for misconduct of the Defendants that occurred while Bush was employed at Focus Direct and surrounding her departure. In particular, Plaintiffs seek to enforce Bush's obligations under her Noncompetition and Confidentiality Agreement ("Agreement"). *See* Ex. A.

6.     The misconduct at issue began in 2010. In mid-2010, Bush told Focus Direct that St. Labre intended to stop purchasing premiums sourced by Diamondback. According to Bush, St. Labre felt that Focus Direct and Diamondback were charging too much for premiums, and that St. Labre would not purchase premiums from them even if prices were reduced. Bush also told Focus Direct that St. Labre had already found a new vendor of premiums.

7.     Unbeknownst to the Plaintiffs, St. Labre's new vendor was Bush's neighbor, Pearl. Pearl had started Pearl Promotions, Inc. in May 2010 to supply premiums to St. Labre. In July 2011, Pearl formed Pearl Productions (dissolved its predecessor), and continued to supply premiums to St. Labre. The two directors/officers of Pearl Productions are (a) Candace Pearl, Inc. (wholly owned and operated by Pearl), and (b) Opulent. Opulent is wholly owned and operated by Bush and her daughter, Laura Bush, and has been run out of Bush's home.

8.     Bush participated in these competitive businesses while she was employed by Focus Direct in violation of her Agreement and duty of loyalty. While this conduct apparently started in 2010, Plaintiffs did not discover Bush's role in it until January 2012, in conjunction

with their investigation of Bush's departure. Defendants' diversion of this work to themselves has resulted and will continue to result in lost revenue of more than $2 million per year.

9.     It appears in hindsight that the beginning of the end of Bush's employment at Focus Direct started in early 2011. In March 2011, DMH merged with one of its main industry rivals, a group of companies known as "Quadriga," and the consolidated group became known as "Qdmh." Bush and the main contact person at St. Labre, Karen Kansala ("Kansala"), harbored negative feelings for Quadriga. As a result, after the merger, Bush's attitude degenerated. For example, in June 2011, Bush threatened to tell Kansala to move St. Labre's work to a competitor. When DMH's Chief Operating Officer, John Rodewald ("Rodewald"), told Bush that "[s]uggesting that SLIS move work out of Focus does not sound like a good strategy," Bush responded, "Whatever," and "I know you are saving your career, and that is ok, but does not mean we [are] all on board with your decisions." *See* Ex. B, 14.[1] Bush later told Rodewald that she had "stayed at Focus for my clients, not because of some false loyalty to a company that lost its heart and soul back in 2003," which was when DMH had acquired Focus Direct. *Id.*, 39.

10.    Bush's loyalties indeed were not to Focus Direct or DMH. For example, she and Kansala joked about and satirized DMH and Qdmh, and Bush sent Kansala confidential internal Qdmh communications that were not meant for clients. *Id.*, 7-9. Bush also started, spread and fomented negative rumors about DMH and Qdmh with St. Labre and St. Jude. All of this misconduct seriously damaged Plaintiffs' relationships with Focus Direct's clients.

11.    Based on Plaintiffs' recent investigation, it appears that Bush started to plan her exit from Focus Direct in October 2011. For example, at that time, she began forwarding Focus Direct confidential information to a personal email account (txjune@aol.com), including information about projects that Focus Direct was doing for St. Labre. *Id.*, 28-35. Then, in late

---

[1] Exhibit B contains emails relevant to this matter organized in chronological order.

November 2011, Bush told Focus Direct that St. Labre was withdrawing its upcoming orders, and moving them to a competitor. The competitor is a company called "ResourceOne." The loss of St. Labre business will result in lost revenues of more than $2.5 million per year.

12.     As a result, starting in early December 2011, Rodewald engaged in a series of phone calls and emails with Bush about St. Labre, St. Jude and AMVETS. Focus Direct wanted Bush to remain at the head of its efforts to regain all of St. Labre's business, and to secure the business of St. Jude and AMVETS. However, in light of Bush's poor attitude, Focus Direct was concerned about whether she was 'on the team', and Bush herself declined to answer specific questions about whether she would commit to lead the charge.

13.     The dialogue between Rodewald and Bush continued throughout December 2011. During that time, Bush handled St. Labre's existing orders and took new orders for Focus Direct, including an order for St. Jude that she submitted on December 21, 2011. *Id.*, 43.

14.     When it eventually became clear that Bush was not going to stay at Focus Direct, Rodewald asked Bush to "work with [the company] cooperatively to transition the Focus Direct clients [she was] responsible for to other Company contacts." *Id.*, 44. Rodewald also advised Bush that DMH intended to enforce the non-compete in her Agreement. In particular, because Bush had refused to answer questions about whether she intended to go to ResourceOne, Rodewald told her that "any involvement with [ResourceOne] would be a per se violation of [her] non-competition agreement." *Id.* Finally, Rodewald asked Bush to "return to [DMH] any and all information, documents, and data that [she] received from or through Focus Direct, including, but not limited to, any and all confidential information and trade secrets." *Id.* Rodewald made that request to Bush on Tuesday, December 27, 2011.

15.     On Thursday, December 29, 2011, Bush responded to Rodewald as follow: "You fired me a couple of weeks ago and your attempt to re-cast that as a resignation is silly." *Id.* On

the next day, Friday, December 30, 2011, a Texas attorney sent Focus Direct's counsel a lawsuit that Bush had filed in Texas a week previously, on December 22, 2011. In that suit, Bush sought a declaratory judgment that her Agreement is unenforceable. *See* Ex. C.

16.     Bush's Texas suit is an attempt to preempt this action. Bush filed in Texas hoping that a Texas state court will apply Texas law to the Agreement, because she believes that the non-compete is unenforceable under Texas law. Bush sued preemptively in Texas because the Agreement has a Delaware choice of law provision (*see* Ex. A, ¶ 8), and Bush is a long-time resident of Florida. The Agreement is enforceable under both Delaware and Florida law.

17.     In the Texas suit, Bush alleged that she "needs to work ... in the industry in which she has worked for thirty two years," *i.e.*, direct mail, and that she has "engaged [in] employment discussions with another potential employer" in the industry. *See* Ex. C, 1. Plaintiffs believe that Bush has in fact already made arrangements to go to work for ResourceOne.

18.     Having received no response from Bush to Rodewald's request on December 27, 2011 to return DMH's materials, DMH's counsel reiterated the request to Bush's counsel on January 5, 2012 verbally and on January 9, 2012 in writing. *See* Ex. D. While initially committing to return the DMH materials, Bush has returned <u>nothing</u> to date.

## Parties

19.     DMH is a limited liability company organized under the laws of the State of Delaware. Its principle place of business is 425 North Iris Road, Mount Pleasant, Iowa.

20.     Focus Direct is a limited liability company organized under the laws of the State of Delaware. Its principle place of business is 9707 Broadway, San Antonio, Texas.

21.     Diamondback is a division of Alaniz, LLC. Diamondback's principle place of business is 844 Ritchie Highway, Severna Park, Maryland.

22.     Bush is an individual residing at 854 Bay Point Drive, Madeira Beach, Florida.

23.     Pearl is an individual residing at 853 Bay Point Drive, Madeira Beach, Florida.

24.     Laura Bush is an individual residing at 7608 Ridge Road, Seminole, Florida. Laura Bush is the daughter of Bush, and works directly with Bush.

25.     Pearl Productions is a corporation organized under the laws of the State of Florida.  Its principal place of business is 404 Orchid Lane, Palm Harbor, Florida.  The two directors and officers of Pearl Productions are (a) Candace Pearl, Inc., which is wholly owned and operated by Pearl, and (b) Opulent.  *See* Exs. E and F.

26.     Opulent is a corporation organized under the laws of the State of Florida.  Its principal place of business was in Bush's home at 854 Bay Point Drive, Madeira Beach, Florida. Opulent is wholly owned and operated by Bush and Laura Bush.  *See* Ex. F.

### Jurisdiction and Venue

27.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. section 1332(a), because the Plaintiffs are all citizens of different states than the Defendants, and the matter in controversy exceeds $75,000, exclusive of interest and costs.

28.     The United States District Court, Middle District of Florida, Tampa Division is an appropriate venue, because the Defendants all reside in Pinellas County, Florida.

### Additional Facts Common to All Counts

A.     The Direct Mail Industry and DMH

29.     The direct mail industry has experienced consolidation and globalization over the past decade.  In times past, many vendors supplied different varieties of products and services to clients.  Consolidation enabled vendors to expand their products and services while achieving economies of scale that lowered costs to clients.  Similarly, the opening of markets in southeast Asia, including China, enabled vendors to capitalize on the lower costs of production in those markets, particularly with respect to manufacturing premiums.

30.     DMH and Quadriga were two of the groups that emerged in the non-profit sector of the industry.  DMH's predecessor started in April 2003 from the merger of Alaniz, LLC in Mount Pleasant, Iowa ("Alaniz") with Mail America Communications, Inc. in Forest, Virginia ("Mail America").  In September 2003, a related (though not identical) group of investors acquired the assets of Focus Direct, which has a production facility in San Antonio, Texas.  In July 2004, the investors then acquired the assets of Mailing and Marketing, Inc. in Carson, California, and renamed it Creative Mailing & Marketing, LLC ("Creative Mailing").  Because of the disparate locations of these various affiliates, in order to create a unified group governed by the same set of laws, all of the affiliates were formed under Delaware law.

31.     In 2005, when new investors sought to purchase equity in the group, the affiliates were restructured so that all of them were owned by one company.  That company was initially called Direct Mail Holding Acquisition LLC ("DMH Acquisition"), a Delaware limited liability company.  Right after the restructuring, DMH Acquisition changed its name to "Direct Mail Holding, LLC," which is the Plaintiff in this lawsuit.[2]  *See* Ex. G.

B.     Bush's Employment at Focus Direct

32.     During her 32 years at Focus Direct, Bush worked primarily with three clients: St. Jude, AMVETS and St. Labre.  She worked with St. Jude and AMVETS for that entire time. She has worked with St. Labre since the late 1990's, when Bush's good friend and contemporary, Karen Kansala (who was a former Focus Direct employee), became the Director of Development at St. Labre in charge of its direct mail programs.

33.     Focus Direct paid Bush well for her work over the course of the years.  By way of example, for the past five years that Bush worked at Focus Direct (*i.e.*, 2007 to 2011), her average annual compensation exceeded $325,000 each year.

---

[2] DMH Acquisition could not start immediately with that the name Direct Mail Holding LLC because that name was being used at the time by the company that held the ownership interests of Mail America and Alaniz.

34.     While Bush was regarded as a good employee in early years, her attitude changed at some point after DMH acquired Focus Direct. For example, she told other DMH employees, as well as people outside the company, that DMH "ran [Focus Direct] into the ground." *See* Ex. B, 22 and 23 ("it is really sad what DMH did to Focus.") She even told Rodewald (her superior) that Focus Direct "will never be the company we once were. You and Pat and Chris and whoever else is in charge then and now made sure of that!" *Id.*, 14 and 38 ("Every decision that has been made for Focus Direct since 2003 has been bad for our company").

35.     At some point after the acquisition, Bush also became highly territorial of St. Jude, AMVETS and St. Labre. For example, she consistently called them 'her' clients. *See e.g. id.*, 1 ("my clients" who "place their trust and confidence in me"), 23 ("my accounts are hanging in with me"), 36 ("I will always protect my clients" and "take care of the trust they have placed in me"), and 39 ("I have managed to continue to take care of my clients"). Bush became so territorial that she insisted that no DMH manager could contact them, claiming that the clients did not like DMH and the affiliates. For example, when Bush was told in June 2011 that a DMH manager needed to be on client conference calls, she responded "well, not mine! ha." *Id.*, 17.

36.     In fact, Bush started to act more like an independent agent for St. Jude, AMVETS or St. Labre than an employee of Focus Direct. She even referred to herself as "the sales rep for St. Labre." *Id.*, 34. She hired her daughter, Laura Bush, to be her assistant, and trained her to work with clients. She also hired and paid an independent artist, Lester Zaiontz, to do creative work for Focus Direct clients, even though Mail America and Alaniz are able to perform that work. Thus, when asked by DMH if there was "any business from the three [clients] that we are not producing," Bush responded, "of course," but "I will not jeopardize my relationship with my clients just to try to get that business," since she felt it was "not suited" for Focus Direct. *Id.*, 26. In reality, Focus Direct's affiliates provide those exact services.

37.     Bush's attitude deteriorated further as a result of the merger between DMH and Quadriga. According to Bush, the merger generated "negative feelings in the industry," at least with "my clients, especially St. Labre." *Id.*, 4. While it is not clear how these feels started, it is clear that Bush fostered negativity towards DMH and Quadriga. For example, in April 2011, Bush improperly sent confidential internal Qdmh communications to Kansala, stating she was "confused" and "d[id]n't really know what [was] going on" at DMH and Qdmh. *Id.*, 7. Kansala responded by satirizing DMH, and stating as follows about Quadriga and Qdmh: "I, for one, am not interested in being left 'hanging' while a room full of adults try to figure out how many families will be left without employment while QUACKS DO MAIL IN HONG KONG!," referring to Qdmh and its China facility. *Id.*, 10. It is apparent that Bush's relationship with Kansala involved derogating DMH and Qdmh, even though she had a duty of loyalty to them, and should have been trying to overcome any unfair prejudices that St. Labre or Kansala may have had.

38.     On July 5, 2011, Focus Direct hired Fred Lederman ("Lederman") as a consultant to help with clients (among other things). Lederman had run Focus Direct before the DMH acquisition, and thus had relationships with many Focus Direct clients, including St. Jude and AMVETS. Based on Lederman's meetings with those two clients, DMH learned that the clients were troubled by the fact that they had no contact with anyone other than Bush, contrary to Bush's claims that the clients did not want any contact with DMH. Lederman also learned that St. Jude had "heard on the street" a negative "rumor" about Quadriga. It was obvious from St. Jude's description of the incident that the source of such information was Bush herself.

39.     Based on these experiences with St. Jude and AMVETS and based on Bush's badly degenerating attitude, DMH was worried that Bush was also undermining Focus Direct's relationship with St. Labre. Because Quadriga has provided database services to St. Labre for many years, Quadriga reached out to St. Labre for a meeting. When Bush found out about that,

she claimed to be in "shock!" at this "lack of professionalism." *Id.*, 36. Instead of seeing this as an opportunity to work with her colleagues at Qdmh, Bush perceived this as a "sister company [attempting] to compete with me and my client." *Id.*, 38.

40.     Rodewald attempted to diffuse the situation through a series of calls and emails with Bush in December 2011. He told Bush that Focus Direct needed to know "whether or not you are on board to work diligently to keep the St. Labre and St. Jude work from leaving." *Id.*, 38. When Bush could not answer that question, Rodewald asked her to think about it get back to him the next day. Bush construed that as a "24 hour ultimatum," stating as follows: "I cannot be a part of your team and, given your ultimatum, I will be moving on." *Id.*, 40. Rodewald assured Bush that there was no ultimatum, although they did "need to be proactive ... to retain this work ...." *Id.*, 41. He also assured Bush that "having [her] lead the charge makes sense," that she was "not being blamed," and that he was "asking for and want[ed] [her] help." *Id.*

41.     Despite those assurances, on December 15, 2011, Bush told Rodewald that she was "moving on," but that she would continue to work "for a week or two for a smooth transition in the best interests of [the] clients." *Id.*, 42. Bush continued to work for Focus Direct, handling St. Labre's existing orders and taking new orders for Focus Direct during that time, including an order for St. Jude that she submitted on December 21, 2011. *Id.*, 43.

42.     Rodewald had a follow up call with Bush on December 21, 2001. When he told Bush during that call that DMH expected her to comply with her non-compete, Bush responded that she was not bound by the non-compete. Rodewald said that DMH believes the non-compete is enforceable, and asked if Bush intends to go to ResourceOne, where St. Labre had moved its business. Bush refused to respond to that question, and ended the conversation.

43.     The next day, December 22, 2011, Bush filed suit in Texas seeking a declaration that her Agreement is unenforceable.  Although the action was filed on that day, Bush's counsel did not serve it or send it to Focus Direct's counsel until over a week later.

44.     Rodewald followed up with Bush by email on December 27, 2011.  He explained to her that, because she had "been clear in the past that [she] wanted minimal involvement of others with St. Labre, St. Jude and Amvets, ... Focus has minimal sales/creative relationships with these three customers."  As a result, he asked Bush to agree that her "resignation [would] be effective as of January 10, 2012 or later," so she could "work with us cooperatively to transition the Focus Direct clients [she] was responsible for to other Company contacts." *Id.*, 44.

45.     Rodewald also followed up on the discussion he and Bush had on December 21, 2011 about her non-compete.  He explained that Focus Direct believes that her "non-competition agreement is entirely enforceable, and that Focus Direct and its parent companies will take all appropriate and necessary legal action to enforce it." *Id.*  He also reiterate that, "[s]ince [Bush] would not answer [his] questions about whether [she] intended to become involved with Resource One or Jim Moore" (the owner of ResourceOne), "any involvement with either of them would be a per se violation of [her] non-competition agreement.") *Id.*

46.     Finally, Rodewald asked in his email on December 27, 2011 that Bush "return to [DMH] any and all information, documents, and data that [she] received from or through Focus Direct, including, but not limited to, any and all confidential information and trade secrets." *Id.*  Having received no response to that request for a week, DMH's counsel reiterated it to Bush's counsel on January 5 and 9, 2012.  *See* Ex. D.  While initially committing to return DMH's materials, Bush has returned <u>nothing</u> to date, and is now making her return of them conditional on DMH settling with her concerning the Agreement.

C.      Bush's Membership Interest and Agreement with DMH

47.      Bush acquired a $25,000 membership interest in Focus Direct when Focus Direct was acquired in 2003. In addition, despite her negativity about DMH, Bush took advantage of opportunities to contribute to and receive an $8,600 additional interest in DMH to help acquire a new printing press at Mail America in 2006 and acquiring ownership in Diamondback in 2007.

48.      Under the LLC agreement, Bush had limited rights with respect to the sale of her DMH membership interest. If she had wanted to sell her interest, she would have had to offer it to Focus Direct or another member first, and (if none were interested) then she could sell to a third party, but Focus Direct and the other members had the right to match any legitimate third party offer and purchase the interest. However, because Focus Direct was closely held and not publicly traded, there was no market for such membership interest, and Bush had no right to compel the company or other members to purchase interest.

49.      When DMH consolidated the affiliates in 2005, Bush was afforded the option to (a) roll-over all of her membership interest in Focus Direct to a *pro rata* equivalent interest in DMH Acquisition, or (b) cash-out some or all of her membership interest in Focus Direct and roll-over the remainder to DMH Acquisition. This cash-out/roll-over option was afforded to members of Focus Direct (and the other affiliates) not as a matter of right, but as a benefit of the restructuring, pursuant to an Equity Purchase Agreement. Bush opted to cash-out a portion of her interest (receiving $5,435.40), and rolled-over $55,000 (*i.e.*, her interest had appreciated significantly from 2003 to 2005) to a *pro rata* equivalent interest in DMH Acquisition.

50.      Bush (and many other employees of Focus Direct and other affiliates) signed a Noncompetition and Confidentiality Agreement in connection with the restructuring and their participation in the Equity Purchase Agreement. It was important to DMH that these individuals

sign such agreements in order to facilitate operational integration of the affiliates, and protect the information that would be shared with these individuals about the consolidated entities.

51.     As a result, the Agreement is between Bush and DMH Acquisition, which changed its name to DMH shortly after Bush signed the Agreement.  The Agreement protects the confidential information and trade secrets of all of the "DMH Companies," which encompasses Focus Direct, Mail America, Alaniz, and Creative Mailing.  *See* Ex. A.  It prohibits Bush from using or disclosing any such materials after the end of her employment.  *Id.*, ¶ 1(b)   It also requires Bush to return all such materials, stating as follows: "Immediately upon termination of employment by the DMH Companies ..., Employee shall return to the DMH Companies all such documents and property then in Employee's possession ...." *Id.*, ¶ 1(c).

52.     In addition to these confidentiality provisions, the Agreement also contains a non-compete designed to protect confidential information, trade secrets, and goodwill that the DMH Companies have with their clients.  In that regard, during a Restricted Period, that Bush may "not, directly or indirectly, engage in any manner or capacity ... in any business activities that are competitive with the business of the DMH Companies in any market in which the DMH Companies operates during the Restricted Period or has plans to enter at the time of the termination of Employee's employment." *Id.*, ¶ 1(a)(i).  It also requires that Bush "not ... induce or attempt to induce any customer ... of the DMH Companies to cease doing business with the DMH Companies or in any way interfere with the relationship between any such customer ... and the DMH Companies." *Id.*, ¶ 1(a)(iii)(d).  The Restricted period is the longer of either five years from the date of the Agreement or one year after the end of Bush's employment with Focus Direct.  *Id.*, ¶ 1(a)(i)  However, that period would be reduced to six months after the end of employment if an employee were terminated without cause. *Id.*

53.     Because the date of the Agreement was July 15, 2005, the Restricted Period for Bush is one year from the end of her employment with Focus Direct. DMH considers Bush's employment to have ended on December 29, 2011, when she falsely stated that Focus Direct had "fired [her] a couple of weeks ago ...." *See* Ex. B, 44. Bush is claiming to have been fired in an attempt to take advantage of the provision in the Agreement that reduces the Restricted Period to six months. However, her own earlier statements that she was "moving on," her agreement to continue working "for a week or two for a smooth transition," and the fact that she continued to work for Focus Direct until at least December 21, 2011, demonstrate that Bush is well aware that she voluntarily resigned from Focus Direct. *Id.*, 40 and 42.

D.     DMH's Confidential Information and Trade Secrets

54.     Bush received DMH's confidential information and trade secrets in her role as a salesperson and a member of DMH. As a salesperson, she of course received (and, in fact, created) such materials related to St. Jude, AMVETS, and St. Labre, including (a) plans and strategies for past, current and upcoming direct mail programs, (b) designs, artwork and other creative materials for past, current and upcoming programs, (c) costs, pricing and profit margins for past and current programs; (d) sourcing, costs, pricing and profit margins for premiums; and (e) donors, donation patterns and levels, and revenues for past and current programs.

55.     In addition to those three clients, Bush also received some of the same types of confidential information and trade secrets related to other DMH clients. She received such materials when she interacted with other DMH salespeople, and when she attended DMH-wide sales meetings. For example, at one such meeting in Las Vegas, Nevada in 2009, Bush received confidential information and trade secrets related to several DMH clients that she did not service, including strategies, plans, designs, artwork, costs, and pricing for past, current and upcoming

programs. This type of collaboration and cooperation was one of the intended benefits of being a part of a larger, integrated organization.

56.    Bush received even more significant types of confidential information and trade secrets in her role as a member of DMH. Since becoming a member of DMH, Bush has received financial statements containing information about monthly and yearly sales and EBITDA (earnings before interest, taxes, depreciation and amortization) for each DMH subsidiary. Such statements include both budgeted and actual sales and EBIDTA for each entity for each given month and year, as well as for the past year and for that month in the past year. In addition, since becoming a member of DMH, Bush has received a summary (and participated in and was invited to phone calls and meetings to discuss the summary) of the financial performance of DMH and each subsidiary. These summaries often discuss the past, current and anticipated financial performance of specific projects for specific clients of the DMH subsidiaries. These summaries also frequently discuss other operational issues at the affiliates that affect financial performance.

57.    DMH considers all of the foregoing materials to be confidential, and has taken reasonable measures to keep such materials confidential. For example, employees and members of DMH and its subsidiaries, including Bush, are all aware that such materials are confidential, because they sign an Agreement containing confidentiality obligations, they are specifically told that the materials are confidential, and/or the materials are marked "Confidential." Bush certainly knew and understood that all such materials were confidential to DMH.

58.    DMH and its subsidiaries derive actual and potential value from such materials not being generally known to or readily ascertainable by others who could derive value from them, including competitors. For example, ResourceOne would derive a tremendous benefit from having such information (or having such information available to it through Bush), because it could use the information related to DMH clients to compete directly for the business of St.

15

Jude, AMVETS, St. Labre, and the other DMH clients that Bush received information about, and it could use the financial and business information to compete against DMH and its subsidiaries. As a result, all of this information and these materials constitute DMH's trade secrets.

      E.    <u>Immediate Threat of Irreparable Harm</u>

      59.    DMH and its subsidiaries have invested a substantial amount of time, resources, effort and money to develop their confidential information and trade secrets. The disclosure of that information to a competitor, like ResourceOne, or the use of it by a former employee, like Bush, for a competitor would result in the loss of the confidential nature of the information that would be irreparable. The loss would be irreparable because it would be extremely difficult, if not impossible, to determine the value of the information used and/or disclosed, the benefit to the competitor from the use and/or disclosure of it, or the value of the business lost into the future by DMH and its subsidiaries by virtue of Bush's and/or the competitor's use or disclosure of it.

      60.    Similarly, Focus Direct has invested substantial time, resources, effort and money to enable Bush to develop goodwill with St. Jude, AMVETS and St. Labre. The use by Bush of that goodwill on behalf of a competitor, like ResourceOne, would be irreparable, because it would be extremely difficult, if not impossible, to determine the value of the lost goodwill, the benefit to a competitor from the use of it, or the value of the business lost into the future by Focus Direct and DMH by virtue of Bush's use of that goodwill for a competitor.

      61.    Bush expressly agreed that a violation of the Agreement "will cause substantial and irreparable harm to DMH and the DMH Companies that would not be quantifiable and for which no adequate remedy would exist at law." *See* Ex. A, ¶ 3. She also agreed that "[i]f there is any such breach, DMH and the DMH Companies will be entitled to seek all available equitable relief in the form of a temporary restraining order, preliminary injunction or permanent

injunction ...." *Id.* Bush therefore has waiving, is estopped, and cannot credibly argue that DMH and Focus Direct are not facing an immediate threat of irreparable harm.

F.      Bush's Allegations in the Texas Case

62.      Bush has made a number of allegations in the Texas case about the enforceability of the Agreement.   Many of those allegations have are addressed above.   Four of those allegations are (a) the Agreement is invalid because DMH Acquisitions is not an existing entity, (b) Bush's continued employment with Focus Direct was not valid consideration for the Agreement, (c) the consideration for the Agreement failed because Bush's commissions were reduced by 10% for a period of time, and (d) by its own terms, the Agreement never became effective. *See* Ex. C., 5-7.   These allegations are factually and legally incorrect.

63.      First, while it is true that Bush entered the Agreement with DMH Acquisition, that entity simply changed its name thereafter to "Direct Mail Holding LLC," which is the Plaintiff in this action.   A simple name change for an entity (just like when an individual changes her name) does not invalidate the entity's contracts.   Moreover, Bush expressly agreed that the Agreement is "binding upon and will inure to the benefit of the parties and their respective successors and assigns," including "any ... business entity that at any time ... acquires all or substantially all of the assets of a party" to the Agreement. *See* Ex. A, ¶ 7.

64.      Second, while Bush's continued employment at Focus Direct would have been sufficient consideration under Delaware and Florida law, that was not the only benefit Bush received for the Agreement.   For example, the roll-over/cash-out option afforded to Bush was not a right but an additional benefit of the restructuring, and Bush took advantage by cashing-out $5,435.40 of her interest.   Also, Bush became an owner of a larger entity (*i.e.*, DMH and all its subsidiaries instead of just Focus Direct), with opportunities to purchase additional membership interests of DMH, which Bush did in September 2006 and October 2007.

65.     Third, Bush alleges that, even if there was consideration for the Agreement, the consideration failed because DMH "breached its promise of continued employment when Focus Direct, LLC notified [Bush] that the impact of the recession required it to reduce [her] salary by 10% and to eliminate matching her 401-k plan." *See* Ex. C, 5-6.  It is true that, from May 15, 2009 to August 31, 2010, Bush (and all other Focus Direct managers) received 10% less in compensation.  However, like all other such managers, Bush agreed to this adjustment because it was necessary for the financial welfare of the company.  Moreover, Bush's 2009 compensation was nearly $328,000, and her 2010 compensation exceeded $354,000.  Thus, Bush received ample consideration, including in 2009 and 2010, to support the Agreement, and she (like the other managers) expressly agreed to take the compensation reduction anyway.

66.     Finally, Bush alleges that the Agreement never took effect because it states that it "shall automatically terminate in the event the closing under the Equity Purchase Agreement is not consummated by July 29, 2005," and the Equity Purchase Agreement was not signed by that day.  The Equity Purchase Agreement was signed three days later than expected, on August 1, 2005.  DMH expressly informed Bush that the Equity Purchase Agreement was signed on August 1, 2005, and asked her to initial and return one page of the Agreement with that new date on it.  *See* Ex. H. Bush did so.  *See* Ex. I.  By doing so, Bush waived any condition or right she may have had with respect to the Equity Purchase Agreement being signed after July 29, 2005, and/or re-entered the Agreement with DMH.  Moreover, rather than raise any issue about the Equity Purchase Agreement, Bush took advantage of the opportunities afforded to her under that agreement, which was conditioned on her signing the Noncompetition and Confidentiality Agreement.  Thus, Bush long ago waived any right she may have had to object to enforcement of her Noncompetition and Confidentiality Agreement on the basis that the Equity Purchase Agreement was signed three days later than expected.

G.    Bush's Allegations in this Case

67.    Bush has claimed in this case that the Agreement does not prevent her from sourcing and selling non-paper premiums because DMH allegedly did not source such premiums before it purchased Diamondback in 2006.

68.    Non-paper dimensional premiums, or "3D premiums," were not prevalent until the late 1990s or early 2000s, when they could be cost effectively sourced from foreign markets, particularly southeast Asia and China.  At first, clients would source 3D premiums themselves, and direct mail providers, like the DMH companies, would put them in the packages and/or send them to donors.  Therefore, the DMH companies have been in the business of 3D premiums ever since their clients used such premiums in their direct mail campaigns.

69.    In early 2004, the DMH companies developed the ability to source 3D premiums themselves.  They entered into an arrangement with a company called Values by Design to source premiums from Hong Kong, registered the trademark "3D Premiums™" to do so, and publicly marketed their ability to source "Custom Three Dimensional Premiums" and "Factory Direct Import Premiums."  *See* Ex. J and K.  As a result, before the purchase of Diamondback in 2006, the DMH companies sourced pen packages and stuffed animal premiums in this way. Bush was aware of the 3D Premiums™ venture by the DMH Companies, and (as a salesperson) had the ability to source such premiums for clients directly through Focus Direct.  *See* Ex. J.

**Count I**
**Breach of Contract – Non-Competition Provision**
**By Defendant June Bush**

70.    Plaintiffs incorporate herein all of the foregoing allegations.

71.    The Agreement is an enforceable contract.  The non-competition provision in the Agreement states that Bush shall "not, directly or indirectly, engage in any manner or capacity … in any business activities that are competitive with the business of the DMH Companies in

any market in which the DMH Companies operates during the Restricted Period or has plans to enter at the time of the termination of Employee's employment." *See* Agreement, ¶ 1(a)(i). The Restricted Period is the longer of five years from the date of the Agreement or one year from the end employment. *Id.* Because the Agreement was dated July 15, 2005, the Restricted Period for Bush is one year from the end of her employment, *i.e.* until December 29, 2012.

72.     The non-competition provision is enforceable against Bush.  The provision is reasonable and no greater than necessary under the circumstances to protect DMH's and Focus Direct's legitimate interests in the confidential information and trade secrets that Bush received in her role as a salesperson for Focus Direct for over 32 years and as a member of either Focus Direct or DMH for over nine years.  The non-competition provision also is reasonable and no greater than necessary under the circumstances to protect DMH's and Focus Direct's legitimate interests in the customer goodwill that Bush developed with St. Jude, AMVETS and St. Labre.

73.     For example, Bush was Focus Direct's main contact with St. Jude and AMVETS for 32 years and with St. Labre for 12 years.  One year is a reasonable amount of time for another salesperson to develop sufficient rapport with these clients (free from competition by Bush) such that DMH and Focus Direct have a reasonable chance to retain the clients.  One year also is a reasonable amount of time (indeed, a far shorter amount of time than necessary) to ensure that DMH's confidential information and trade secrets would not be directly useable by a competitor. In addition, direct mail is a global industry, so state, national and international boundaries mean little.  Therefore, the geographic restriction in the non-competition provision is reasonable and necessary to protect DMH's confidential information, trade secrets, and customer goodwill.

74.     Bush has expressly agreed that the non-competition provision is "reasonable and necessary to protect the legitimate interests of DMH and the DMH Companies." *Id.*, ¶ 3.  She also has agreed that, even if the provision were overbroad, "such provision will be construed to

cover only that duration, geographical extent or activities that are valid and enforceable," and that the provision "is to be given the construction which renders [it] valid and enforceable to the maximum extent ... possible under applicable law." *Id.*, ¶ 4.

75.     Bush has violated, is violating, and is threatening to violate the non-competition provision.  She has violated and is violating that provision by engaging in the activities of Pearl Productions (and its predecessor) to provide premiums to St. Labre in competition with Focus Direct and Diamondback.  In addition, Bush claims that she "needs to work ... in the industry in which she has worked for thirty two years," *i.e.*, direct mail, and admits that she has "engaged [in] employment discussions with another potential employer" in the industry.  *See* Ex. C, 1. Plaintiffs believe Bush has in fact already made arrangements to go to ResourceOne.  All such conduct is a violation and threatened violation of the non-competition provision.

76.     Bush violated, is violating, and/or is threatening to violate the non-competition provision willfully and maliciously, knowing that her conduct is wrongful.

77.     As a result, DMH is entitled to recover injunctive relief (including a temporary, preliminary and permanent injunction), equitable relief (including restitution and disgorgement of all wrongfully obtained revenues and profits), damages (including compensatory damages, consequential damages, and punitive damages), interest, costs and attorney's fees.  *See Kaung v. Cole Nat'l Corp.*, 884 A.2d 500, 506 (Del. 2005); Fla. Stat. § 542.335(k).

## Count II
### Breach of Contract – Non-Solicitation Provision
### By Defendant June Bush

78.     Plaintiffs incorporate herein all of the foregoing allegations.

79.     The Agreement is an enforceable contract.  The non-solicitation provision in it states that Bush shall "not ... induce or attempt to induce any customer ... of the DMH Companies to cease doing business with the DMH Companies or in any way interfere with the

relationship between any such customer ... and the DMH Companies." *See* Ex. A, ¶ 1(a)(iii)(d). The Restricted Period is the longer of five years from the date of the Agreement or one year from the end employment. *Id.* Because the Agreement was dated July 15, 2005, the Restricted Period for Bush is one year from the end of her employment, *i.e.* until December 29, 2012.

80.     The non-solicitation provision is enforceable against Bush.   The provision is reasonable and no greater than necessary under the circumstances to protect DMH's and Focus Direct's legitimate interests in the confidential information and trade secrets that Bush received in her role as a salesperson for Focus Direct for over 32 years and as a member of either Focus Direct or DMH for over nine years.   The non-solicitation provision also is reasonable and no greater than necessary under the circumstances to protect DMH's and Focus Direct's legitimate interests in the customer goodwill that Bush developed with St. Jude, AMVETS and St. Labre.

81.     Because Bush was Focus Direct's main contact with St. Jude and AMVETS for 32 years and St. Labre for 12 years, one year is a reasonable time for another salesperson to develop sufficient rapport with these clients (free from competition by Bush) such that DMH and Focus Direct have a reasonable chance to retain the clients.  One year also is a reasonable time to ensure that DMH's client-related confidential information and trade secrets would not be directly useable by a competitor.    In addition, because direct mail is a global industry, the global restriction in the non-solicitation provision is reasonable and necessary to protect DMH's customer goodwill and client-related confidential information and trade secrets.

82.     Bush has expressly agreed that the non-solicitation provision is "reasonable and necessary to protect the legitimate interests of DMH and the DMH Companies." *Id.*, ¶ 3.  She also has agreed that, even if the provision were overbroad, "such provision will be construed to cover only that duration, geographical extent or activities that are valid and enforceable," and

that the provision "is to be given the construction which renders [it] valid and enforceable to the maximum extent … possible under applicable law." *Id.*, ¶ 4.

83.     Bush has violated, is violating, and is threatening to violate the non-solicitation provision. Bush has violated and is violating the non-solicitation provision by (a) inducing St. Labre to stop purchasing premiums from Focus Direct and Diamondback and instead purchase them from Pearl Productions (and its predecessor), (b) inducing St. Labre to stop purchasing direct mail products and services (and/or reducing the amount it purchases) from Focus Direct and instead purchasing them from ResourceOne, and (c) inducing or attempting to induce St. Jude to stop purchasing direct mail products and services (and/or reducing the amount it purchases) from Focus Direct and instead purchasing them from a competitor. In addition, Bush claims that she "needs to work" in the direct mail industry, and admits that she has "engaged [in] employment discussions" with an employer in the industry. *See* Ex. C, 1. Plaintiffs believe Bush has in fact already made arrangements to go to ResourceOne. All such conduct is a violation and threatened violation of the non-solicitation provision.

84.     Bush violated, is violating, and/or is threatening to violate the non-solicitation provision willfully and maliciously, knowing that her conduct is wrongful.

85.     As a result, DMH is entitled to recover injunctive relief (including a temporary, preliminary and permanent injunction), equitable relief (including restitution and disgorgement of all wrongfully obtained revenues and profits), damages (including compensatory damages, consequential damages, and punitive damages), interest, costs and attorney's fees. *See Kaung v. Cole Nat'l Corp.*, 884 A.2d 500, 506 (Del. 2005); Fla. Stat. § 542.335(k)

## Count III
### Breach of Contract – Confidentiality Provision
### By Defendant June Bush

86.     Plaintiffs incorporate herein all of the foregoing allegations.

87.     The Agreement is an enforceable contract.  The confidentiality provision in the Agreement states that Bush "shall not divulge, furnish, or make accessible to anyone or use in any way ... any confidential or secret information or knowledge of the DMH Companies." *See* Ex. A, ¶ 1(b).  The provision also states that, "[i]mmediately upon termination of employment by the DMH Companies ..., Employee shall return to the DMH Companies all such documents and property then in Employee's possession ...." *Id.*, ¶ 1(c).

88.     Bush has violated, is violating, and is threatening to violate the confidentiality provision.  She violated and is violating it by using and disclosing confidential information in the course of engaging in the activities of Pearl Productions (and its predecessor) to provide premiums to St. Labre.  She also violated, is violating, and is threatening to violate that provision by failing and refusing to return DMH's confidential information after being asked to do so by Rodewald on December 27, 2011 and by Focus Direct's counsel on January 5 and 9, 2012.

89.     Bush violated, is violating, and/or is threatening to violate the confidentiality provision willfully and maliciously, knowing that her conduct is wrongful.

90.     As a result, DMH is entitled to recover injunctive relief (including a temporary, preliminary and permanent injunction), equitable relief (including restitution and disgorgement of all wrongfully obtained revenues and profits), damages (including compensatory damages, consequential damages, and punitive damages), interest, costs and attorney's fees.  *See Kaung v. Cole Nat'l Corp.*, 884 A.2d 500, 506 (Del. 2005); Fla. Stat. § 542.335(k)

### Count IV
### Breach of Duty of Loyalty
### By Defendant June Bush

91.     Plaintiffs incorporate herein all of the foregoing allegations.

92.     As a long-time, trusted employee of Focus Direct and member of DMH, Bush had a duty of loyalty to Focus Direct and DMH.  That duty required Bush to (a) act only in the best

interests of Focus Direct and DMH while she was employed by Focus Direct, (b) refrain from competing with Focus Direct and DMH while she was employed by Focus Direct, (c) refrain from soliciting Focus Direct and DMH clients for herself or a competitive business while she was employed by Focus Direct, (d) refrain from using or disclosing Focus Direct or DMH confidential information for herself or a competitor while she was employed by Focus Direct and after her employment with Focus Direct ended, and (e) returning all Focus Direct and DMH confidential information and property after her employment with Focus Direct ended.

93.     Bush breached her duty of loyalty by (a) disparaging Focus Direct, DMH and Qdmh to clients and others outside the company, (b) starting, spreading and/or fomenting negative rumors about Focus Direct, DMH and Qdmh with clients and others outside the company, (c) competing with Focus Direct and DMH by engaging in activities with Pearl Productions (and its predecessor) while employed by Focus Direct, (d) inducing St. Labre to stop purchasing premiums from Focus Direct and Diamondback and instead purchase them from Pearl Productions (and its predecessor) while employed by Focus Direct, (e) inducing St. Labre to stop purchasing direct mail products and services (and/or reducing the amount it purchases) from Focus Direct and instead purchase them from ResourceOne while employed by Focus Direct, (f) inducing or attempting to induce St. Jude to stop purchasing direct mail products and services (and/or reducing the amount it purchases) from Focus Direct and instead purchase them from a competitor while employed by Focus Direct, and (g) using and/or disclosing Focus Direct and/or DMH confidential information for and/or on behalf of herself, Pearl Productions (and its predecessor), and ResourceOne while employed by Focus Direct and/or thereafter.

94.     Bush also violated, is violating, and is threatening to violate her duty of loyalty by failing and refusing to return Focus Direct's and DMH's confidential information and property after being asked to do so on December 27, 2011 and on January 5 and 9, 2012.

95.     As a result, DMH is entitled to recover injunctive relief (including a temporary, preliminary and permanent injunction), equitable relief (including restitution and disgorgement of all wrongfully obtained revenues and profits), damages (including compensatory damages, consequential damages, and punitive damages), interest and costs.

**Count V**
**Misappropriation of Trade Secrets**
**By All Defendants**

96.     Plaintiffs incorporate herein all of the foregoing allegations.

97.     Bush received (and created) a significant amount of DMH and Focus Direct data, documents, information and other materials in her role as a salesperson for Focus Direct and a member of DMH.  Such materials include data, documents, and information concerning (a) plans, strategies, designs, artwork, other creative materials, sourcing, costs, pricing, profit margins, donors, donation patterns, donation levels, and revenues for past, current and future programs for St. Jude, AMVETS, St. Labre, and other DMH clients, (b) monthly and yearly actual and budgeted sales and EBITDA for each DMH subsidiary, (c) past, current and anticipated financial performance of specific projects for specific clients of the DMH subsidiaries, and (d) financial performance of DMH and each of the DMH subsidiaries.

98.     DMH and Focus Direct consider all of the foregoing materials to be confidential, and have taken measures reasonable under the circumstances to ensure that such materials are kept confidential.  In addition, DMH and its subsidiaries derive actual and potential value from such materials not being generally known to or readily ascertainable by others who could derive value from them, including competitors.  As a result, all of the foregoing data, documents, information and other materials constitute DMH's and Focus Direct's trade secrets.

99.     All of the Defendants have misappropriated, are misappropriating, and/or are threatening to misappropriate DMH's and Focus Direct's trade secrets.  Bush has done so, is

26

doing so, and/or is threatening to do so by using, disclosing, and/or threatening to use and disclose the trade secrets for herself, Pearl Productions (and its predecessor), and ResourceOne, despite the fact that she had and has a duty to maintain the confidentiality of them. The other Defendants have done so, are doing so, and/or are threatening to do so by using, disclosing, and/or threatening to use and disclose the trade secrets of DMH and Focus Direct's that they acquired from Bush, who had and has a duty to maintain the confidentiality of them.

100.    All of the Defendants have misappropriated, are misappropriating, and/or are threatening to misappropriate DMH's and Focus Direct's trade secrets willfully and maliciously, knowing that their conduct is wrongful.

101.    As a result, DMH is entitled to recover injunctive relief (including a preliminary and permanent injunction), equitable relief (including restitution and disgorgement of wrongfully obtained profits), damages (including compensatory damages, consequential damages, and double damages), interest, costs and attorney's fees. *See* Fla. Stat. § 688.001 *et seq.*

### Count VI
### Conversion
### By All Defendants

102.    Plaintiffs incorporate herein all of the foregoing allegations.

103.    Bush received DMH and Focus Direct data, documents, and other materials in her role as a salesperson for Focus Direct and a member of DMH that are the property of DMH and Focus Direct. The other Defendants received such data, documents, and other materials from Bush. Despite requests for the return of such data, documents, and other materials to DMH and Focus Direct, the Defendants have failed and refused to return them, and have continued to exercise wrongful dominion over the property of DMH and Focus Direct.

104.    As a result, DMH is entitled to recover injunctive relief (including a preliminary and permanent injunction), equitable relief (including restitution and disgorgement of wrongfully

obtained profits), damages (including compensatory damages, consequential damages, and punitive damages), interest, costs and attorney's fees. *See* Fla. Stat. § 772.185.

**Count VII**
**Tortious Interference with Contract and with Existing and**
**Prospective Advantageous Business and Contractual Relations**
**By Defendant June Bush**

105.     Plaintiffs incorporate herein all of the foregoing allegations.

106.     Focus Direct had valid contracts and prospective contractual relations with St. Labre to provide products and services related to direct mail and premiums.  Bush knew about those contracts and prospective contractual relations.  Bush interfered with those contracts and prospective contractual relations by inducing St. Labre to withdraw upcoming orders it had placed with Focus Direct and transfer that work to a competitor, ResourceOne, and by inducing St. Labre to transfer its premium business to Pearl Productions and its predecessor.  Such interference was wrongful because Bush's conduct was deceitful, dishonest and/or disloyal.

107.     Given Focus Direct's history of providing direct mail products and services to St. Jude, AMVETS and St. Labre, Focus Direct has existing and prospective advantageous business and contractual relations with those three clients, which Bush knew about.  Bush interfered with and is threatening to interfere with those existing and prospective advantageous business and contractual relations by inducing and/or causing St. Jude, AMVETS and St. Labre to purchase direct mail products and services from a competitor of Focus Direct, which the clients otherwise would have purchase from Focus Direct in the absence of Bush's interference.  Such interference was wrongful because Bush's conduct was deceitful, dishonest and/or disloyal.

108.     Given Focus Direct's and Diamondback's history of providing premiums to St. Labre, Focus Direct and Diamondback had existing and prospective advantageous business and contractual relations with that client, which Defendants knew about.  The Defendants interfered with those existing and prospective advantageous business and contractual relations by inducing

28

and/or causing St. Labre to stop purchasing premiums from Focus Direct and Diamondback and instead purchase them from Pearl Productions (and its predecessor). Such interference was wrongful because the conduct was deceitful, dishonest and/or disloyal.

109.   As a result, DMH is entitled to recover injunctive relief (including a temporary, preliminary and permanent injunction), equitable relief (including restitution and disgorgement of all wrongfully obtained revenues and profits), damages (including compensatory damages, consequential damages, and punitive damages), interest and costs.

### Count VIII
### Tortious Interference with Contract and with Existing and Prospective Advantageous Business and Contractual Relations By Defendants Laura Bush, Pearl, Pearl Productions and Opulent

110.   Plaintiffs incorporate herein all of the foregoing allegations.

111.   The Agreement is a valid contract between DMH and Bush. Laura Bush, Pearl, Pearl Productions and Opulent knew of that contract, and interfered with it by inducing and/or causing Bush to violate the Agreement by (a) competing with Focus Direct and DMH while she was employed by Focus Direct, (b) inducing St. Labre to stop purchasing premiums from Focus Direct and Diamondback and instead purchase them from Pearl Productions (and its predecessor) while she was employed by Focus Direct, and (c) using and/or disclosing Focus Direct and/or DMH confidential information and/or trade secrets for Pearl Productions (and its predecessor). Such interference was improper because the conduct was deceitful and dishonest.

112.   Focus Direct had valid contracts and prospective contractual relations with St. Labre to provide premiums. Laura Bush, Pearl, Pearl Productions and Opulent knew about those contracts and prospective contractual relations. Laura Bush, Pearl, Pearl Productions and Opulent interfered with those contracts and prospective contractual relations by inducing St. Labre to transfer its premium business to Pearl Productions and its predecessor. Such interference was improper because the conduct was deceitful and dishonest.

113.   As a result, DMH is entitled to recover injunctive relief (including a temporary, preliminary and permanent injunction), equitable relief (including restitution and disgorgement of all wrongfully obtained revenues and profits), damages (including compensatory damages, consequential damages, and punitive damages), interest and costs.

**Count IX**
**Deceptive and Unfair Trade Practices**
**By All Defendants**

114.   Plaintiffs incorporate herein all of the foregoing allegations.

115.   All of the Defendants have engaged, are engaging, and are threatening to engage, directly or indirectly, in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce.  Such conduct includes (a) disparaging Focus Direct, DMH and Qdmh to clients and others outside the company for their own competitive purposes, (b) starting, spreading and/or fomenting negative rumors about Focus Direct, DMH and Qdmh with clients and others for competitive purposes, (c) competing with Focus Direct and DMH while Bush was employed by Focus Direct, (d) inducing St. Labre to stop purchasing premiums from Focus Direct and Diamondback and instead purchase them from Pearl Productions (and its predecessor) while Bush was employed by Focus Direct, (e) inducing St. Labre to stop purchasing direct mail products and services (and/or reducing the amount it purchases) from Focus Direct and purchase them from a competitor, ResourceOne, while Bush was employed by Focus Direct, (f) inducing or attempting to induce St. Jude to stop purchasing direct mail products and services (and/or reducing the amount it purchases) from Focus Direct and instead purchase them from a competitor while Bush was employed by Focus Direct, (g) using and/or disclosing Focus Direct and/or DMH confidential information and/or trade secrets for their own competitive purposes, and (h) interfering with Focus Direct's contracts and with

Focus Direct's and Diamondback's existing and prospective advantageous business and contractual relations for their own competitive purposes. *See* Fla. Stat. § 501.201 *et seq.*

116.   All Defendants engaged, are engaging, and are threatening to engage in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts and/or practices willfully and maliciously, knowing that their conduct is wrongful.

117.   As a result, DMH is entitled to recover injunctive relief (including a preliminary and permanent injunction), equitable relief (including restitution and disgorgement of wrongfully obtained profits), damages (including compensatory damages, consequential damages, and punitive damages), interest, costs and attorney's fees. *See* Fla. Stat. § 501.2501 *et seq.*

### **Request for Jury Trial**

118.   Plaintiffs request a trial by jury on any and all claims, counterclaims, cross claims, defenses, and affirmative defenses to which they are entitled to a jury trial.

### **Requests for Relief**

WHEREFORE, the Plaintiffs request that the Court:

A.   Temporarily, preliminary and permanently (until December 29, 2012) enjoin Bush from, directly or indirectly, engaging in any manner or capacity in any business activity competitive with DMH or Focus Direct, including working for ResourceOne;

B.   Temporarily, preliminary and permanently (until December 29, 2012) enjoin Bush from inducing or attempting to induce any customer of DMH or Focus Direct, including St. Jude, AMVETS and St. Labre, to cease doing business with the DMH or Focus Direct or in any way interfering with the relationship between any such customer and DMH or Focus Direct;

C.   Order the Defendants to return to DMH and Focus Direct any and all data, documents, information and other materials that constitute or comprise confidential information, trade secrets and/or property of DMH or Focus Direct;

D.      Temporarily, preliminary and permanently enjoin the Defendants from using or disclosing any and all data, documents, information and other materials that constitute or comprise confidential information and/or trade secrets of DMH or Focus Direct;

E.      Temporarily, preliminary and permanently enjoin the Defendants from interfering with Focus Direct's contracts, or Focus Direct's and Diamondback's existing and prospective advantageous business and contractual relations, with St. Jude, AMVETS, and St. Labre;

F.      Temporarily, preliminary and permanently (until December 29, 2012) enjoin Laura Bush, Pearl, Pearl Productions and Opulent from interfering with Bush's Agreement with Focus Direct, including permitting her to engage in any activity related to Pearl Productions;

G.      Temporarily, preliminary and permanently enjoin the Defendants from engaging in any and all unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in trade or commerce;

H.      Enter judgment in favor of the Plaintiffs;

I.      Award the Plaintiffs compensatory damages;

J.      Award the Plaintiffs consequential damages, including lost profits;

K.      Award the Plaintiffs double compensatory and consequential damages;

L.      Award the Plaintiffs punitive damages;

M.      Award the Plaintiffs the reasonable attorneys fees incurred by them;

N.      Award the Plaintiffs the costs incurred by them;

O.      Award the Plaintiffs pre and post judgment interest; and

P.      Grant any other or further relief that the Court deems necessary or appropriate.

## Verification

 I, John Rodewald, hereby declare under the pains and penalties of perjury that the factual allegations in paragraphs 1-18, 29-69, 71-75, 79-84, 87-88, 92-94, 97-99, 103, 106-108, 111-112, and 115-116 are true and correct to the best of my personal knowledge and belief.

Dated: March 9, 2012

_____

John Rodewald

 I, David Collins, hereby declare under the pains and penalties of perjury that the factual allegations in paragraph 1-3, 6-11, 29, 33-37, 39, 41-42, 44-46 and 54-61 are true and correct to the best of my personal knowledge and belief.

Dated: March 9, 2012

_____

David Collins

## Verification

I, John Rodewald, hereby declare under the pains and penalties of perjury that the factual allegations in paragraphs 1-18, 29-69, 71-75, 79-84, 87-88, 92-94, 97-99, 103, 106-108, 111-112, and 115-116 are true and correct to the best of my personal knowledge and belief.

Dated: March 9, 2012

_____
John Rodewald


I, David Collins, hereby declare under the pains and penalties of perjury that the factual allegations in paragraph 1-3, 6-11, 29, 33-37, 39, 41-42, 44-46 and 54-61 are true and correct to the best of my personal knowledge and belief.

Dated: March 9, 2012

_____
David Collins

Dated: March 10, 2012                    s/Andrew Froman
                                         Andrew Froman, Esq.
                                         Fla. Bar No. 019429
                                         E-mail: afroman@laborlawyers.com
                                         Caryn N. Diamond, Esq.
                                         Fla. Bar No. 0052056
                                         Email: cdiamond@laborlawyers.com
                                         Fisher & Phillips LLP
                                         401 E. Jackson St., Suite 2300
                                         Tampa, Florida 33602
                                         Telephone: (813) 769-7500
                                         Facsimile: (813) 769-7501

Dated: March 10, 2012                    s/Cameron G. Shilling
                                         Cameron G. Shilling, Esq.
                                         *Admitted Pro Hac Vice*
                                         N.H. Bar No. 11363
                                         Email: cameron.shillling@mclane.com
                                         McLane, Graf, Raulerson & Middleton
                                         900 Elm Street, P.O. Box 326
                                         Manchester, New Hampshire 03105-0326
                                         Telephone: (603) 628-1351
                                         Facsimile: (603) 625-5650

                                         For the Plaintiffs